# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRUCE SCOTT, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALLIED WASTE SERVICE OF | : | |
| BUCKS-MONT, | : | |
|     Defendant. | : | No. 10-105 |
| | : | |

## MEMORANDUM

Schiller, J.                                                                                                                    December 23, 2010

      Plaintiff Bruce Scott brings claims under the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), and the Pennsylvania Human Relations Act ("PHRA"), stemming from his employment with Defendant Allied Waste Services of Bucks-Mont ("Allied Waste"). Currently before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

## I.     BACKGROUND

      Bruce Scott was employed by Allied Waste as a laborer or "helper" beginning in May of 2003, assisting drivers collect waste from residential customers. (Pl.'s Opp'n to Def.'s Mot. for Summ J. Ex. 26A [Scott Dep.] 124.) Scott reported to Bob Fries, his route supervisor, and David Davidson, his operations supervisor. (*Id.* at 144-46.) Scott worked with multiple drivers, including Dan Zeek. (*Id.* at 148.)

      Scott is a divorced father of three, the youngest of whom lives with him and suffers from severe hemophilia. (*Id.* at 82, 86.) Due to his hemophilia, Scott's son becomes bedridden if injured.

(*Id.* at 114.) His son requires someone to give him regular injections of medicine to control this condition, usually about three or four times per week. (*Id.* at 82, 99.) Scott always assists with the injections because his son does not feel comfortable doing it by himself. (*Id.* at 114.) Furthermore, his son's condition results in internal bleeding in his joints that becomes so painful that he cannot walk. (*Id.* at 94-95). His son's participation in certain activities, such as sports, is limited: he "has to watch what he does, as far as getting banged around, or anything that can cause a bleed." (*Id.* at 83.)

Scott requires periodic absences from work to attend to his son and administer his medication. Scott told his supervisors at Allied Waste about his son's condition and the potential need for time off around the time he started working there. (*Id.* at 366.) In 2007, Allied Waste granted Scott three days off so he could take a medical course certifying him to administer injections to his son. (*Id.* at 337.) In June of 2008, Scott requested two or three weeks' leave to be with his son, both because of his son's medical needs and because of Scott's recent divorce. (*Id.* at 339-41.) Allied Waste granted this request. (*Id.* at 344.) On November 23, 2008, Scott again requested leave to take care of his son. (*Id.* at 347.) This request was also granted, although the approval from Allied Waste's corporate office in Arizona was sent to the wrong address. Scott received the approval on the day he was terminated. (*Id.* 347-50.)

Scott has not been medically diagnosed with a disability, but has a "nervous, twitchy disposition"; he characterizes himself as "somewhat animated." (Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. 2; Scott Dep. 139.) Over the course of his employment, Scott's co-workers have made remarks concerning his "animated" disposition. For example, after Scott began working with Dan Zeek, Zeek "began calling [him] crazy all the time . . . ." (Scott Dep. 151.) Other workers

sometimes called him "loco." (*Id.* at 152.) Defendant's human resources clerk, Kelly Grater, testified that other Allied Waste workers said Scott was a "wacko" who was "a danger to himself and others." (Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. Ex. 31 [Grater Dep.] 15.)

Scott has a history of disciplinary violations at Allied Waste. In 2006, he received six write-ups for unexcused and excessive absences and tardiness. (Def.'s Mot. for Summ. J. Exs. 2-7 [Corrective Action Reports dated Jan. 16, 2006; Feb. 23, 2006; Mar. 8, 2006; Apr. 28, 2006; July 10, 2006; Aug. 21, 2006].) In 2007, he received six similar write-ups. (*Id.* Exs. 8-13 [Corrective Action Reports dated Mar. 15, 2007; July 17, 2007; Nov. 14, 2007; Nov. 19, 2007 (two reports); Nov. 27, 2007].) He received three similar write-ups in 2008. (*Id.* Exs. 14-16 [Corrective Action Reports dated Apr. 30, 2008; May 6, 2008; and Sep. 17, 2008].) The last write-up Scott received warned him that additional attendance problems before the end of 2008 would result in termination. (Corrective Action Report dated Sep. 17, 2008.)

On June 6, 2008, Davidson heard from Zeek that Scott had allegedly made comments to Zeek about wanting to kill himself, such as that he was going to step out in front of an Allied Waste truck because he had nothing to live for, and that he was going to jump from a truck into a tree. (Defs.' Mot. for Summ. J. Ex. 24 [Aff. of Kevin Davidson ¶ 3].) Scott denies making any such comments. (Scott Dep. 212-14.) Nevertheless, Davidson ordered that Scott be medically cleared to work before he was allowed on an Allied Waste truck again. (Aff. of Kevin Davidson. ¶ 4.) On June 9, 2008, Scott was examined at the company doctor's office. (Scott Dep. 254.) During this examination, Scott gave a urine sample and was asked whether he had any suicidal thoughts, because "the company was concerned about [his] mental state." (*Id.* at 256, 260.) Scott told the doctor that he "felt fine" to return to work. (*Id.* at 263.) Scott was cleared to return, and he reported to work the

3

day after the examination. (*Id.* at 267.) After the medical examination, Scott was no longer assigned to work with Zeek. (*Id.* at 274.) Instead, Scott was "bounced around" to different trash routes and sometimes assigned to lower paying "yard work." (*Id.* at 479-80; 511.) On December 22, 2008, Scott was not scheduled to work, but nevertheless arrived at the Allied Waste facility where he usually reported in order to drop off his uniforms for cleaning. (Scott Dep. 286.) Scott showed up around 5:00 a.m. and clocked in, but then realized he made a mistake and clocked out a few minutes later. (*Id.* at 294-96.) On that day, his son was sick, so Scott wanted to return home as soon as possible to attend to him. (*Id.* at 204.) Around the time Scott was punching in, Scott ran into fellow employee Keith Hibbard. (*Id.* at 297.) Scott, who does not drive, asked Hibbard if he could give him a ride home. (*Id.*) Hibbard responded that he might be awhile, and so Scott "figured [he was] going to head home right then and there" on his bicycle. (*Id.* at 298.) While Scott was leaving, Bob Fries passed by and asked if Scott had ever been scheduled for a particular route. (*Id.* at 297.) Scott responded that he remembered the route, but that he had not worked that route for over a year. (*Id.*) Shortly thereafter, Fries walked away and Scott left for home. (*Id.* at 305.)

Allied Waste offers a different version of the events of December 22. According to Fries, after asking Scott about his old route, Fries asked Scott to wait before going home, because he might need Scott to show a driver the route. (Def.'s Mot. for Summ. J. Ex. 21 [Memo from Bob Fries regarding Bruce Scott termination].) After the driver told Fries that Scott would indeed be of help on the route, Fries went to the spot Scott was waiting, but Scott was nowhere to be found. (*Id.*) Fries and Hibbard determined that Scott had walked out on the job. (*Id.*) Scott denies that Fries ever asked him to stay at the facility in case they needed him to work. (Scott Dep. 304-06.)

The next day, on December 23, Scott reported to work around 5:00 a.m. (Scott Dep. 321.)

Shortly thereafter, Fries approached Scott and said that he needed to speak with him. (*Id.*) Scott then met with Fries, Hibbard, Bob Pletcher, a site supervisor, and General Manager Brent Swartz. (*Id.*) Swartz then told Scott that his actions on December 22 constituted job abandonment and that Scott would be terminated. (Scott Dep. 321, 331) Allied Waste maintains that in addition to the December 22 incident, the decision to terminate Scott was informed by his lengthy disciplinary record. (Def.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ¶¶ 25-26.) However, Swartz testified that if Scott had not abandoned his job on December 22, he would not have been fired. (Def.'s Mot. for Summ. J. Ex. 29 [Swartz Dep.] 37.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). A court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Goodman v. Pa. Tpk. Comm'n*,

5

293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

### A. "Regarded As" Claim Under the ADA

Scott's first claim alleges that Allied Waste unlawfully terminated him because it regarded him as having a mental disability. To make out a prima facie case for employment discrimination under the ADA, a plaintiff must demonstrate that he is a "qualified individual with a disability" within the meaning of the Act, and that he has suffered an adverse employment as a result of the disability. *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 512 (3d Cir. 2001). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA also prohibits covered employers from discriminating against employees on the basis of "being regarded as having" an impairment that substantially limits one or more major life activities.[1] 42 U.S.C. § 12102(3); 42 U.S.C. § 12112(a). For a person to be "disabled" under the "regarded as" portion of the ADA, "the individual must demonstrate either that: (1) despite having no impairment at all, the employer erroneously believes

---

[1] 42 U.S.C. § 12102 was amended by the ADA Amendments Act of 2008 (ADAAA), with an effective date of January 1, 2009. As amended, § 12102 no longer requires a plaintiff bringing a claim under the "regarded as" prong to show he was perceived to have an impairment limiting a major life activity. 42 U.S.C. § 12102(3) (2009). The parties do not dispute that the relevant events occurred prior to January 1, 2009. Although Scott argues that the ADAAA should apply retroactively or should at least inform the Court's analysis, the Court declines to apply the amendments retroactively. *See Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 37 (2006) (statutes are not given retroactive effect absent explicit language or necessary implication); *Supinksi v. United Parcel Serv., Inc.*, Civ. A. No. 06-0793, 2009 WL 113796, at *5 n. 6 (M.D. Pa. Jan.16, 2009) (noting consensus that the ADA Amendments are not applied retroactively).

that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities." *Tice*, 247 F.3d at 514.

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Stouch v. Twp. of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009); *Fuentes v. Perskie*, 32 F. 3d 759, 763 (3d Cir. 1994); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). The plaintiff then bears the burden of establishing that this proffered reason is a pretext for discrimination. *Stouch*, 354 F. App'x at 666, *Fuentes*, 32 F. 3d at 763. The Third Circuit has explained:

> [I]n order to prove the employer's explanation is pretextual, the plaintiff must cast sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication . . . or allow the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Stouch,* 354 F. App'x at 666 (quoting *Fuentes,* 32 F.3d at 762).

Although the parties dispute whether Scott has set forth sufficient evidence to establish that Allied Waste regarded him as "disabled" within the confines of the ADA, the Court will assume Scott has made out a prima facie case. Nonetheless, Scott has failed to carry his burden to show that Allied Waste's proffered reasons for his termination were pretextual. Allied Waste has argued that Scott was terminated on December 23 for job abandonment and because of his excessive absences, and has offered copies of over a dozen disciplinary write-ups, along with a form Scott signed acknowledging that unexcused absences are cause for termination. Allied Waste has also offered a detailed memorandum outlining the December 22 events that led to Scott's termination. In response, Scott disputes what occurred on December 22, and points to the deposition testimony of

7

Swartz, in which he testified that Scott would not have been fired for his pattern of absences and tardiness had he remained available to work on December 22. (Swartz Dep. 37) However, Swartz also testified that he would not have fired Scott for walking off the job if Scott had not had such an extensive disciplinary history. (*Id.*) While there are factual disputes relating to the circumstances of his termination, Scott has failed to put forth sufficient evidence from which a factfinder could "either disbelieve the stated reasons or conclude that discrimination was the motivating or determinative factor" in Allied Waste's decision to terminate him. *Majewski v. Fischi*, 372 F. App'x 300, 304 (3d Cir. 2010). Scott argues that a jury could infer that Allied Waste's supposed reasons for terminating him were "mere pretext to remove a person supervisors disliked." Even if this were true, Scott must put forth sufficient evidence that Allied Waste's reasons were a pretext for *discrimination*, not a pretext for something else. *See Roberts v. Randstad N. Am., Inc.*, 231 F. App'x 890, 896 (11th Cir. 2007) ("[D]islike alone is not evidence of discrimination.").

While Scott has offered evidence that various co-workers and supervisors made comments to the effect that he was "crazy," Scott has not offered any evidence tending to link these remarks to the decision to terminate him. Scott must show more than that Allied Waste's decision to terminate him was "wrong or mistaken," but must demonstrate that "it was so plainly wrong that it cannot have been the employer's real reason." *Baker v. United Defense Indus., Inc.*, No. 09-4273, 2010 WL 4997648, at *4 (3d Cir. Dec. 8, 2010) (quoting *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir.1997)); *see Keller*, 130 F.3d at 1109 ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."). The evidence demonstrates that whatever transpired on December 22 between Scott and Fries, Swartz believed that Scott's purported job abandonment was grounds for termination. There is no

8

evidence to suggest Scott was terminated for any other reason. Accordingly, Scott's "regarded as" ADA claim fails.

B. **Scott's Claim of an Illegal Medical Examination**

Scott next claims that the June 2008 medical examination he was required to undergo was unlawful under the ADA. 42 U.S.C. § 12112(d)(4)(A) provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

"To establish a prima facie case under § 12112(d)(4), the plaintiff must demonstrate that: (1) the plaintiff is an employee of the defendant, and (2) that the policy either requires a medical examination or requires disclosure of information regarding a disability or that "may tend to reveal a disability." *Pa. State Troopers Ass'n v. Miller*, 621 F. Supp. 2d 246, 251-52 (M.D. Pa. 2008). A plaintiff must also show he has suffered an "injury in fact." *Tice*, 247 F.3d at 519-20. If the employee presents a prima facie case, the employer has the burden of demonstrating that the examination is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see Ward v. Merck & Co.*, 226 F. App'x 131, 141 (3d Cir.2007) Maintaining occupational safety and ensuring that employees are mentally fit to perform their duties qualify as business necessities. *See Ward,* 226 F. App'x at 140-41.

Assuming that he can make out a prima facie case, Scott has not put forth sufficient evidence to rebut Allied Waste's contention that the psychological examination was consistent with business necessity. On this point, Scott's principal argument is that there is a factual dispute as to whether Scott made any statements concerning committing suicide at work. Scott also argues that Davidson's affidavit, which detailed the reasons for ordering the examination, constitutes

9

inadmissable hearsay because it recounts what Zeek is alleged to have told Davidson that he heard from Scott. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2008) (holding that hearsay evidence that would be inadmissible at trial may not be considered on summary judgment). However, as Allied Waste points out, Zeek's and Scott's statements are not being offered for their truth, but rather for their effect on the listener, Davidson. *See* Fed. R. Evid. 801; *Marks v. Marina Dist. Dev. Co.*, 213 Fed. App'x 147, 153 (3d Cir. 2007). Accordingly, the Court may consider the affidavit. It is undisputed that Zeek informed Davidson that Scott discussed committing suicide. Davidson thus had a legitimate business reason for ordering the examination: concern for the safety of Allied Waste's employees. The Court therefore grants Allied Waste's motion as to Scott's medical examination claim.

### C.   Associational Discrimination Claim

In his third claim, Scott alleges that Allied Waste unlawfully discriminated against him under the "association" provision of the ADA, which prohibits discrimination in employment against a qualified individual because of the "known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Scott alleges that Allied Waste's knowledge of his son's hemophilia was a determining factor in Allied Waste's decision to terminate him. Specifically, Scott points to instances during which Allied supervisors were reluctant to give Scott unpaid leave to care for his son, including a statement to Scott that he had to decide what was more important: his job or his family.

The ADA's association provision "does not obligate employers to accommodate the schedule of an employee with a disabled relative. Although refusal to mak[e] reasonable accommodations may constitute illegal discrimination against a disabled employee . . . the plain language of the ADA

10

indicates that the accommodation requirement does not extend to relatives of the disabled." *Erdman v. Nationwide Ins. Co.,* 582 F.3d 500, 510 (3d Cir. 2009). The question for the Court, therefore, is whether Scott has adduced sufficient evidence from which a reasonable jury could infer that Allied Waste terminated him *because of* his son's disability. *See id.* Scott must demonstrate that Allied Waste was motivated by his son's disability rather than by Scott's "stated intention to miss work; in other words, that [he] would not have been fired if [he] had requested time off for a different reason." *Id.* This Scott has failed to do. There is nothing in the record to suggest that Allied Waste fired him because his son was disabled. Although some courts have held that an employee would be protected by the ADA's association provision if an employer feared that an employee *might* miss work to take care of a disabled relative, the record in this case lacks evidence that Scott was terminated based on "unfounded stereotypes and assumptions arising from the employer's relationship with particular disabled persons." *See Erdman*, 582 F. 3d. at 510-11 (quoting *Oliveras-Sifre v. Puerto Rico Dep't of Health*, 214 F.3d 23, 26 (1st Cir.2000)). To the contrary, the record indicates that Allied Waste was aware of Scott's son's disability since he was hired and granted him time off to attend to his son on multiple occasions. Therefore, the Court will grant Allied Waste's motion with respect to Scott's "affiliated" ADA claim.

    **D.    FMLA Claim**

Scott's next claim is for unlawful retaliation under the FMLA. He alleges that Allied Waste terminated him for taking FMLA leave in November of 2008. To make out a prima facie case for retaliation under the FMLA, a plaintiff must show: (1) that he invoked the protections of the FMLA, (2) that he suffered an adverse employment action, and (3) that there was a causal relationship between the adverse employment action and the invocation of FMLA rights. *Erdman*, 582 F.3d at

508. Once a plaintiff has shown a prima facie case of retaliation, "the familiar burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green* applies, such that the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Michniewicz v. Metasource, LLC*, Civ. A. No. 09-2974, 2010 WL 4703540, at * 8 (E.D. Pa. Nov. 19, 2010).

Even if Scott can establish a prima facie case, he cannot establish that there is a genuine issue of material fact as to whether Allied Waste's proffered reasons for termination were pretextural. As noted above, Allied Waste has offered evidence of Scott's extensive disciplinary history, along with an explanation that Scott walked out on the job on December 22. Scott has not offered any evidence that he was terminated for invoking his rights under the FMLA—only speculation. Also, Scott testified that he took FMLA leave on two prior occasions, and that he did not suffer any adverse action from Allied Waste. With regard to his request for FMLA leave on November 24, Scott admits that the request was granted, and does not point to anything indicating that Allied Waste disapproved of him taking or requesting this time off. There is nothing to suggest that "the trier of fact can reasonably infer from the falsity of the explanation [offered] that the employer is [covering up] a discriminatory purpose." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 (3d Cir.2005). The Court therefore grants Defendant's motion with respect to Scott's FMLA claim.

E.  **PHRA Claim**

Scott's final claim is a pendent Pennsylvania discrimination claim based on the same allegations as his ADA claims. Because "the PHRA is basically the same as the ADA in relevant respects and Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts," the Court's disposition of Scott's ADA claim applies with equal force to Scott's

PHRA claim. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002). For the reasons stated above in the Court's discussion of Scott's ADA claim, the Court also grants Allied Waste's motion with respect to Scott's PHRA claim.

## IV.    CONCLUSION

The Court will enter summary judgment against Scott and in favor of Allied Waste for the reasons discussed above. An Order consistent with this Memorandum will be docketed separately.